UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
DANIEL CAMPBELL,

                Plaintiff,

      -against-

COMMISSIONER JOSEPH PONTE, et al.,

                Defendants.
----------------------------------X

15cv8048

OPINION & ORDER

WILLIAM H. PAULEY III, District Judge:

      Daniel Campbell brings this federal civil rights action against the City of New York, New York City Department of Correction ("DOC") Commissioner Joseph Ponte, and three corrections officers. Campbell alleges that several corrections officers ignored his requests for medical care and failed to intervene when he attempted to injure himself prior to a court appearance. Defendants move to dismiss, arguing that Campbell fails to allege administrative exhaustion; fails to state a claim for municipal liability; and fails to state a claim against Commissioner Ponte. Defendants' motion is denied as to exhaustion, but granted as to the municipal liability claim and Commissioner Ponte.

## BACKGROUND

      The allegations in the Complaint are accepted as true for purposes of this motion.[1] On July 13, 2015, New York City corrections officers transported Campbell from Rikers Island to the New York Supreme Court, Queens County, for a court appearance. (Compl. at 2–3.) Upon arrival, Campbell, who is schizophrenic, was placed in a group holding cell with other pretrial detainees. (Compl. at 2–3, 10.) While in the holding cell, Campbell reportedly

---

[1] Campbell filed the Complaint pro se, but counsel has since appeared in this action on his behalf.

experienced a "mental breakdown." (Compl. at 3, 10.) Afterwards, the corrections officers moved Campbell to a separate cell, where he "started to cut up [his] left arm, in a[n] attempted suicide." (Compl. at 16.) Campbell alleges that the corrections officers abused him verbally and failed to summon medical care. (Compl. at 16–17.) Campbell remained in the cell for nine hours without treatment, and then was bussed back to Rikers Island. (Compl. at 16.)

Campbell alleges that his arm was "still bleeding" when he returned to Rikers Island, but no officer escorted him to the infirmary until 11:30 p.m. (Compl. at 18.) When he arrived at the infirmary, he was informed that no doctors could assist him at that hour. (Compl. at 18.) Campbell was not treated until 10:00 a.m. the next morning. (Compl. at 18.) As a result, Campbell's arm was "cut up and needed to be bandage[d] up" and he suffered "emotional and psychological damage." (Compl. at 3.)

Between July 16 and July 18, 2015, Campbell filed grievance forms with Rikers Island, requesting an investigation of the corrections officers involved in the incident and their names and shield numbers. (Compl. at 21–29.) But DOC did not respond to Campbell's grievances. Campbell also sought similar information from DOC in a request under New York's Freedom of Information Law ("FOIL"), but that request was denied. (Compl. at 30.)

On October 13, 2015, Campbell filed this action. While the motion to dismiss was pending, Campbell's counsel wrote to DOC, attaching copies of Campbell's grievance forms and seeking a response. (Pl.'s Opp., at 33–34, 44–45.) DOC later returned the forms to Campbell's counsel, endorsing "NG" on each form, an indication that DOC viewed Campbell's requests as "not grievable" under Rikers Island's Inmate Grievance Resolution Program. (Pl.'s Sur-Reply, at 6–30.)

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two-pronged approach." Iqbal, 556 U.S. at 679. First, a court must take the plaintiff's "factual allegations to be true and draw[] all reasonable inferences in the plaintiff's favor." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" Hayden v. Patterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

## DISCUSSION

### I. Failure to Exhaust Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Abney v. McGinnis, 380 F.3d 663, 666–67 (2d Cir. 2004). Exhaustion is mandatory, not discretionary. See Booth v. Churner, 532 U.S. 731, 739 (2001).

The appropriate administrative remedies to be "exhausted" turn on the grievance procedures available at the relevant correctional facility. See Jones v. Bock, 549 U.S. 199, 218 (2007). At Rikers Island, complaints are subject to a five-step process known as the Inmate Grievance Resolution Program ("IGRP"). See Ribot v. City of New York, No. 14-cv-3917, 2016 WL 462514, at *2 & n.1 (S.D.N.Y. Jan. 28, 2016). When DOC does not respond to a filed grievance that is covered by the IGRP, the inmate has not "exhausted" his administrative remedies. Rather, "the burden is on the grievant to seek a hearing." Ribot, 2016 WL 462514, at *2. After an inmate requests a hearing, the Inmate Grievance Resolution Committee must issue a written decision. If the inmate is dissatisfied with the decision, he must appeal to the commanding officer of the facility, then to the Central Office Review Committee, and finally to the New York City Board of Correction. "Only after these steps are followed can an inmate file suit in the district court." Ribot, 2016 WL 462514, at *2 n.1 (citation omitted). Because Campbell did not seek a hearing when DOC failed to respond to his grievance, Defendants contend that he did not exhaust his administrative remedies.

Courts in this Circuit have sometimes employed judicially created exceptions to excuse an inmate's failure to exhaust administrative remedies where: "(1) administrative remedies were not in fact available to the prisoner, (2) defendants' own actions inhibit[ed] exhaustion, or (3) special circumstances . . . justif[ied] non-exhaustion." Messa v. Goord, 652 F.3d 305, 309 (2d Cir. 2011) (internal quotation marks omitted) (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)). But four days after oral argument on this motion, the Supreme Court rejected these exceptions. See Ross v. Blake, 136 S. Ct. 1850 (2016). Observing that the PLRA sets forth a specific, statutory exhaustion requirement, the Court stated that "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants

-4-

them to." Ross, 136 S. Ct. at 1857. The Court concluded that the PLRA includes only a single "textual exception"—that an inmate must only exhaust remedies that are "available," i.e., remedies that are "capable of use" to obtain "some relief for the action complained of." Ross, 136 S. Ct. at 1859 (internal quotation marks omitted).

The Supreme Court outlined "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Williams v. Correction Officer Priatno, --- F.3d ----, 2016 WL 3729383, at *4 (2d Cir. 2016) (citing Ross, 136 S. Ct. at 1859). Administrative remedies would be "unavailable" (1) when the applicable grievance procedures are a "dead end"; (2) when the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use"; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Williams, 2016 WL 3729383, at *4 (quoting Ross, 136 S. Ct. at 1860). Here, Campbell alleges no facts suggesting that IGRP procedures would have been a "dead end," or that prison officials coerced him into abandoning his grievances. However, the policy Campbell should have followed in pursuing his grievance was "prohibitively opaque" and appears to be a Catch-22. See Williams, 2016 WL 3729383, at *6.

Grievance procedures are deemed so "opaque" as to be "unavailable" when they are "so confusing that . . . no reasonable prisoner [could] use them." Ross, 136 S. Ct. at 1859 (internal quotation marks omitted). In Williams v. Correction Officer Priatno, the Second Circuit recently applied this standard to an inmate who attempted to grieve a harassment complaint from a "special housing unit" ("SHU") at Downstate Correctional Facility. In accord with New York State's policy for SHU inmates, the plaintiff handed a grievance form to a corrections officer

rather than filing it personally. After receiving no response, the plaintiff was transferred to another facility. He then filed suit in district court, where the defendants argued that he failed to take an administrative appeal from the transferor facility's failure to respond. The Second Circuit disagreed, noting New York State's procedures only contemplated "appeals of grievances that were actually filed," not appeals handed to corrections officers. See Williams, 2016 WL 3729383, at *5. The Circuit found the facility's procedure for appealing an "unfiled and unanswered grievance [] prohibitively opaque, such that no inmate could actually make use of it." 2016 WL 3729383, at *6. The Circuit further noted that New York State's policies did not address how such an inmate should procure an appeal after being transferred. 2016 WL 3729383, at *7. But the Circuit did not directly address the issue here: what a New York City inmate must do when he alleges that he "filed" a grievance, but received no response.

At Rikers Island, Campbell's complaint would have been subject to the IGRP process if it related to a "mental and medical health complaint[] involving DOC personnel." Garvin v. Rivera, No. 13-cv-7054, 2015 WL 876464, at *3 (S.D.N.Y. Feb. 28, 2015). The complaint would be "not grievable," and therefore not covered by that process, if it involved allegations of "assault, harassment, or unprofessional conduct by DOC staff," or if the complaint concerned "quality of care by medical or mental health staff or requests for [a] second medical opinion." (Pl.'s Opp. Ex. D, at 4.) Because Campbell made allegations that would fall in both categories—namely, DOC (and medical staff) failed to provide him with medical care, provided him with inadequate medical care, harassed him, and otherwise acted improperly—it is not clear which grievability classification would have applied to Campbell's claims.

Normally, when grievance procedures are "susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion."

Ross, 136 S. Ct. at 1859. But here, even Defendants could not determine which interpretation of their own grievance procedures to follow. In their motion, Defendants' counsel argued that Campbell's claims "clearly fall" within the ambit of grievable claims under the IGRP process. (Defs.' Reply, at 10.) But their client—the Department of Correction—later informed Campbell's counsel that it considered his complaints to be not grievable. (Pl.'s Sur-Reply, at 6–30.) If DOC and its lawyers cannot "make sense" of what Campbell was expected to do with respect to this complaint, then no "ordinary prisoner" could be expected to do so either. Ross, 136 S. Ct. at 1859; Kucharczyk v. Westchester Cnty., 95 F. Supp. 3d 529, 546–47 (S.D.N.Y. 2015) (inmate was given differing answers from staff as to appropriate procedures when he tried to file a grievance); cf. Torrence v. Pesanti, 239 F. Supp. 2d 230, 234 n.4 (D. Conn. 2003) ("[D]oes this case involve a denial of treatment, a claim for which exhaustion is required? Or does it involve a disagreement about treatment, which is 'non-grievable,' and thus has no remedies which may be exhausted?"). In sum, Campbell was not required to pursue his unanswered grievances or rejected FOIL requests any further because it was "prohibitively opaque" whether any additional steps should have been taken under the IGRP. Defendants have failed to meet "their initial burden" on a motion to dismiss of showing that administrative remedies were available to Campbell. See Williams, 2016 WL 3729383, at *6 n.6.

II. Municipal Liability

To subject the City of New York to municipal liability, Campbell must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (citations omitted). To allege an unconstitutional "policy," the municipality must have implemented

certain procedures through a "policy statement, ordinance, regulation or decision." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91 (1978)). To allege an unconstitutional "custom," the identified practice must be so "persistent or widespread" as to constitute a "custom or usage with the force of law." See Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004). Normally, "a single incident of unconstitutional activity is not sufficient to impose liability under Monell." Claudio v. City of New York, 423 F. Supp. 2d 170, 172 (S.D.N.Y. 2006) (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 823–24 (1985)). "The mere assertion that such a policy exists 'is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" Wrobleski v. Bellevue Hosp., No. 13-cv-8736, 2015 WL 585817, at *3 (S.D.N.Y. Jan. 30, 2015) (citation omitted).

The Complaint alleges that DOC has a policy of keeping inmates with mental illnesses in the same holding cells as other inmates awaiting court appearances at the New York Supreme Court, Queens County. But Campbell has not plausibly alleged any connection between such a policy and the alleged deliberate indifference that gave rise to his injuries. See City of Canton v. Harris, 489 U.S. 378, 385–86 (1989) ("[The] first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."). Campbell alleges that while housed with other inmates, he "strip[ped] naked" and had to be "held down" while an officer dressed him in a jumpsuit. (Compl. at 16.) The injuries that form the basis of the request for relief—that Campbell was "cut[ting] up [his own] left arm, in a[n] attempted suicide," and was refused assistance from correctional officers and medical staff—apparently occurred afterwards, when Campbell was placed in a cell separate from the general prison population.

Accordingly, Campbell has not adequately alleged a causal connection between his injury and the alleged municipal policy.

Campbell also alleges that the City of New York should be subjected to Monell liability because it inadequately trained its corrections officers regarding pretrial detainees with mental health issues. A municipality "may [] be liable simply by reason of its deliberate indifference to a known custom or practice of its employees—for example, by failing to train the employees to act otherwise." Nicholson v. Scoppetta, 344 F.3d 154, 166 (2d Cir. 2003) (citing City of Canton, 489 U.S. at 391). To state such a claim, a plaintiff must "identify a specific deficiency in the city's training program and establish that [the] deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (quoting City of Canton, 489 U.S. at 391). But Campbell provides only the threadbare statement that the City's training was inadequate. This "boilerplate assertion" is "insufficient, without more, to state a Monell claim." Triano v. Town of Harrison, 895 F. Supp. 2d 526, 540 (S.D.N.Y. 2012).

III.   Individual Liability of Commissioner Ponte

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." Victory v. Pataki, 814 F.3d 47, 67 (2d Cir. 2016) (internal quotation marks and citations omitted). To assert a § 1983 claim against a supervisory defendant, a plaintiff must plead facts suggesting the supervisor's "personal involvement." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). Here, the only allegation regarding Commissioner Ponte is that he is the Commissioner of Correction, and therefore ultimately responsible for DOC's failure to respond to his

grievances. Because this allegation simply relies upon the Commissioner's "high position of authority," it is insufficient to state a claim for supervisory liability. See Victory, 814 F.3d at 67.

## CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part. Plaintiff's Monell claims against the City of New York and his claims against Commissioner Ponte are dismissed. Defendants' motion to dismiss the Complaint for failure to exhaust administrative remedies is denied. The Clerk of Court is directed to terminate the motion pending at ECF No. 21.

Dated: July 19, 2016
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.